"Mediation: An Old Dog with Some New Tricks" by David Stern published in Litigation, Volume 24, No. 4, Summer 1998. Copyright 1998 by the American Bar Association. Reprinted by Permission.

1 of 1 DOCUMENT

Copyright (c) 1998 American Bar Association
Litigation

Summer, 1998

*24 Litigation 31*

**LENGTH:** 5832 words

MEDIATION: AN OLD DOG WITH SOME NEW TRICKS

By David M. Stern

David M. Stern is with Stern, Neubauer, Greenwald & Pauly in Santa Monica, California.

**TEXT:**
[*31] Popular press reports trumpet the end of litigation in favor of a novel method of dispute resolution: mediation. The fanfare notwithstanding, mediation is neither new nor likely to replace litigation. Mediation is just negotiation in the presence of a disinterested third party. Like the man who was astonished to find that he had been speaking in prose all his life, litigators have been mediating all their careers.

Not true, say the critics, mediation is different because it is a "collaborative process," dedicated to "win-win" resolutions and designed to achieve "consensus." Trial lawyers, the same commentators contend, are ill-equipped for this new phenomenon because their focus has been on beating the opponent, even humiliating him, and by doing that, they not only fail to create value but destroy it. In fact, mediation is not all that different, but to the extent it is, litigators must and can adapt.

Mediation is on a continuum with litigation because clients, not lawyers, control both these processes -- and multiple variants of them -- and clients negotiate for the same reason they litigate. They want to win and, if they can't win, they want to achieve those goals they can at the least possible cost. Clients use whatever approaches they need to accomplish their goals, just as trial lawyers use different techniques to accomplish their clients' goals. Our clients care as much about which technique we use to cure their legal ills, as we care about which antibiotic our physicians use to cure our infections. Results, not methods, count, and it is results that litigators have to deliver, whether in litigation, arbitration, negotiation or mediation.

The new fascination with mediation should help litigators focus on one important point: most cases settle. We all know that and yet, as litigators, we typically spend less time thinking about how a particular strategy will play to the adversary than to the judge and jury. It may be time to utilize some of the same skills we have honed thinking about how to win at trials that occur only infrequently, preparing ourselves and our clients for mediation that occurs far more often.

Properly preparing for the likelihood of settlement rather than trial involves not just a lawyer's factoring the odds into his approach, but also educating the client about the entirety of the dispute resolution process, and involving him in decisions that will affect the probability and shape of an eventual settlement. Informing your client when he is flush with righteous indignation that he is more than 90 percent likely to make peace with the incarnation of evil who has wronged him -- or sued him -- isn't easy, but it is necessary. As the professional, you can't be only a cheerleader. You must guide your client to maximize the value of the case. You wouldn't let him threaten a witness or hold an angry press conference, because you know how harmful that would be in court. Expressing that same indignation in a pleading, perhaps by peppering a complaint with allegations of fraud or racketeering, may not hurt your cause in court, but it certainly could impede an advantageous resolution later on. All acts must be considered in light of their ability to affect, positively and negatively, the chance of settlement, as much as they must be assessed for their influence on the result if the case is tried.

Psychological factors are important, but they do not stand alone. Other, less emotional, elements intrude on early decisions. You should consider whether the presence of a potentially insured claim, or the naming of additional parties will be more or less likely to lead to a satisfactory settlement. On the one hand, more claims can mean more leverage, as can more parties or the presence of covered claims. The presence of additional parties, however, can make settlement exponentially more difficult. A covered claim, while potentially adding a deep pocket, can also take away one of the major incentives to settle: the cost of litigation.

While plaintiffs generally have a greater impact on settlement possibilities, a defendant is not powerless to shape a [*32] settlement strategy. Should a defective complaint, even a curably defective one, be subject to an early motion, such as one to dismiss or for a more definite statement? In the normal litigation context, the answer is often no, unless the motion can be dispositive. Let the other side live with a less than perfect complaint, and do not educate it early. Yet, from a settlement approach, an early victory can often be decisive. It can undermine a client's confidence in his lawyer, particularly if the defect ought to have been spotted. Or it may change the momentum of the case, potentially even leading to substantial delays in discovery (e.g., with respect to securities fraud cases covered by the Private Securities Litigation Reform Act of 1995).

A defective complaint also offers defense counsel the opportunity to open a dialogue with his opponent. A letter, citing facts and cases, can place an opponent on notice that you are knowledgeable and well prepared. It can also be a vehicle on which to build settlement.

Assuming that you and your client agree that the case will probably settle at some point, it is crucial to focus on two key questions: (1) What are your goals for the litigation? and (2) When is it best to initiate settlement discussions?

Knowing what you want from a particular case is obviously a crucial first step, not just in mediating, but in any manner of dispute resolution, even on the decision of whether or not to sue, as there are lawful methods of dispute resolution other than litigation to solve disagreements. Working with a client to define his goals will also help determine not only when, but whether negotiation is advisable. If the client needs a "big score" to save his failing business, forget early negotiations. They can't produce such a result; that will happen if and only if you either obtain a big jury verdict or have a reasonable chance of achieving one and the other side has no alternative but to pay. Not a case in a thousand can produce a bonanza result early.

If your client, however, can live with something less than unconditional surrender -- and particularly if he wants or needs a continuing relationship with his adversary -- then negotiation is advisable, maybe even in advance of suit. Indeed, one of the great strengths of negotiation over litigation is that it can achieve more creative solutions. Disputes over defective construction can be solved consensually by prompt repair. Construction defect litigation produces verdicts for money damages paid months or years in the future. A dispute over improper past pricing may be resolved by granting one party discounts for a period of time. Infringement claims can lead, and many have led, to cross-licenses. Litigation is limited and, by its nature, leads to a few well-defined endpoints. Negotiation leads wherever the parties are willing to go.

So, if negotiation, whether in the presence of a mediator or not, is one of the ways of achieving your client's goals, how do you get there? There is no single answer, but one of the keys is knowing how to initiate discussion, as the process of resolution must progress gradually in order to succeed.

At least some practitioners believe that parties should negotiate like they vote in Chicago, "early and often." There is attractiveness to that approach, but there is a pitfall: permitting negotiation to be so easy may cheapen its value. In most cases, serious negotiation occurs infrequently, and the even more serious (and expensive) process of mediation must by necessity be occasional at best; thus, it is essential to pick the moment to mediate with the greatest care.

What is the right moment? In general, the danger of mediating too early in the case is that the parties are not yet ready to settle. The anger hasn't subsided and there is too little information. The parties feel like they are playing poker without knowing their own hands, let alone having a clue as to their adversary's. By contrast, if you wait too long, the parties may have become intransigent, sold on the nobility of their own case and burdened by ever-increasing litigation costs, which can themselves become an obstacle to a settlement.

There are no hard and fast rules as to when that perfect moment has arrived to mediate, when the parties know just enough but not too much, when their anger has subsided but their ardor still remains, when enough has been spent to understand the case, but when not so much has been wasted to have crossed the point of no return. One point is clear. Before you begin, recognize that the first obstacle to starting the dialogue early may well be your own client, particularly if you have not represented him in the past. He may wonder if you lack confidence in yourself or the case if

you push for settlement too early. On the other hand, if you don't mention settlement to the more sophisticated client, he may well wonder whether you are looking to "milk" a case that will likely never be tried. As such, begin with the adversary only after you have reached a consensus with your own client.

Once you and your client have made the decision to discuss settlement, how do you commence the dialogue about settlement without sending the wrong message? There are several tried and true tricks to reach that point.

President Kennedy, in his 1961 inaugural address, said it best: "Let us never negotiate out of fear. But let us never fear to negotiate." Initiate discussions with the other side with President Kennedy's quote in mind -- and repeat it verbatim to your opponent, as it is hard to say it any better. Or, if you are uncomfortable with such eloquence, here are some easier opening lines:

- My client (or my firm) has a policy of exploring settlement early in a case. Would you be interested in discussing a framework for alternative dispute resolution?

- The local rules require that we discuss methods of alternative dispute resolution, so let's talk about them.

[*33] - As strong as you and I -- and our clients -- feel about this case, we've both been at this game long enough to know we'll probably wind up settling. When do you think it might be best to explore that option?

Any and all of these disarming openers -- and countless others -- can break the ice. None makes you look weak. It simply makes clear that you weren't sworn into the bar yesterday, or, if you were, that you have spoken to someone with greater experience and have the good sense to recognize the obvious.

Once the dialogue starts, be ready to engage the other side seriously with your thoughts. Discuss whether the parties could use a few depositions to evaluate the issues or whether it would be best to defer depositions until after serious settlement discussions. Talk about whether documentary discovery might be helpful. Consider and discuss with the other side whether motions may be needed to determine if there is a viable claim or how many viable claims there may be (including any that could support punitive damages). Consider whether it is better to mediate before a potentially dispositive motion. If you are a defendant and think you probably will lose the motion, but that the plaintiff is worried its case might die, mediation in advance of a dismissal motion is ideal.

At some point, negotiation may reach an impasse, and when it does, or even better, in anticipation of that point, it is useful to consider when to mediate, because only a third party can bridge the differences between (or among) the parties. In anticipation of that eventuality, conduct negotiations with your opponent with the likelihood of mediation in mind. When your opponent asks, "What does you client want?" you have to respond judiciously. Ask for too much -- the out-of-the-ballpark response -- and the other side may see you as unrealistic, discouraging future negotiations. By contrast, an offer too close to your bottom line leaves you no room to negotiate. Negotiation is almost always a dance that begins with offers on the extremes and moves slowly towards the center. Be cognizant of that by making sure your opener is in the dance hall, but not too near the center of the floor, in order to give yourself flexibility at the mediation.

Be aware that mediation cannot wait forever. Even aside from the costs and hostility that lengthy litigation produces, excessive settlement discussion can produce its own negatives. However, moving to mediation itself involves substantial planning.

At some point, either you or your adversary should state the obvious: "Our clients need a third party to bridge the gaps and to inject some reality into the process." Assuming both sides agree, you still have a number of choices. Who should be the mediator? Where will the mediation take place?

Medical authorities have often remarked about something called the Lourdes Phenomenon. The waters of a grotto spring in Lourdes, France, are reputed to have healing qualities which believers claim stems from a visit to that small town by the Virgin Mary in the mid-nineteenth century. While theologians and skeptics can quibble over the likelihood of a pilgrimage to Lourdes curing the afflicted, medical evidence does exist to support benefits from such a trip, which some two million faithful make annually. Curiously, the distance a pilgrim travels from his home to Lourdes appears to be positively correlated with his or her recovery. The longer the trip, the more likely there will be a cure. At least some medical authorities have speculated that the rationale behind this is that those who travel farther have more invested in a cure and, to the extent that psychological and related factors contribute to health and disease, the long-traveling pilgrim has more incentive to be aided by the healing waters of Lourdes.

Mediation offers a parallel. If two parties mediate without preparation and have to travel just around the corner to the office of the mediator, how much have they invested? If the mediator does not charge, how much do the parties value his input? The Lourdes phenomenon, applied to mediation, generates certain rules. First, make sure both sides prepare long and hard for a mediation. Don't schedule it for the day after tomorrow. Schedule it for two, four, or six weeks hence. If possible, select a mediator whose office is slightly inconvenient to both parties. This does not mean it has to be in Lourdes, but getting there should represent a significant effort by both sides, rather than a convenient cost-free alternative.

The most important quality any mediator can possess is the ability to persuade your adversary. Each of us knows we are reasonable -- or as reasonable as we should be. We can control our own client, or had best learn how to do so in advance of the mediation. Sometimes the best way to set the stage is to let the other side choose the mediator, subject only to your veto. Obviously, this approach should be applied judiciously. An irretrievably biased mediator will rarely be helpful. But, if you are a plaintiff and your opponent wants to choose a lawyer or judge who has a pro-defendant reputation, you can easily turn this to your advantage. If the mediator suggests a result you are uncomfortable with, you can always decline and concurrently remind your adversary that it is not surprising that "his" mediator supported a settlement offer that was too low. If you are happy with the suggestion, look at the power you have in the mediation. You can correctly look at your adversary and say, "You chose retired Judge X, because you know he has a pro-defense reputation and even he won't buy your case. How are you going to do in court with a less defense-oriented judge and jury?"

In addition to the preceding selection factor, consider reputation. Some mediators are creative. You may not have a corner on the wisdom market; a good mediator may truly add value. Also, make sure you have a mediator who really knows how to keep a secret. Often, however much you want to avoid disclosing material, you find yourself having to do so. Using an experienced mediator who knows how to reveal what he is supposed to reveal and keep confidential what he is not supposed to reveal is critically important.

However discreet the mediator may be, the law of mediation privilege remains new, uncertain and uneven: as such, it is far better practice to have a pre-mediation agreement that defines the scope of the mediation privilege. Be aware of one pitfall. Make it clear in the agreement that there is a mediation privilege, not an immunity. If you learn something during [*34] the mediation, e.g., the identity of a witness, you can depose the witness even if you can't use what was said about the witness during the mediation.

Along these same lines, you and your client must be aware that a statement made during mediation will educate the other side and will likely be the basis for future discovery. If you disclose that you have spoken to a particular witness whose statement is helpful to your cause, you can rest assured that the witness's deposition will be noticed immediately if the mediation does not produce a settlement. If you obtained that witness's affidavit -- as a safeguard against a change in testimony -- you can rest equally assured that you will be asked to produce it. If you have a smoking gun, it may be appropriate, even wise, to reveal it at a mediation, but understand that a surprise works only once.

As much as your client would like to see the case resolved yesterday or, at the latest, tomorrow, resist the urge to mediate too quickly. Trial dates are set well into the future because getting ready for trial takes time. Mediation is no different. I generally advocate a period of 30-60 days, although commercial realities may make that range impractical. To see why that time frame is ideal, consider what should happen from the time you decide to mediate until you actually do so.

No litigator would go to trial without a thoroughly considered and well-laidout plan for every feasible eventuality. One is generally developed and polished over the life of the case so that almost everything that can happen is considered in advance. Needless to say, surprises will occur, but in general, the good litigator will have anticipated better than 90 percent of the shape of the trial well in advance of its commencement and even will have considered hundreds of possibilities that never materialize. Doing the same in anticipation of mediation is not just helpful, but essential.

In addition to defining and developing carefully your side's goals, try to understand what your opponent wants. Developing win-win resolutions, however trite that expression may be, is the key to successful mediation. To figure this out, consider assembling a mediation team much as you would put together a trial team. Your mediation team will consist of client representatives who are aware of the issues, who have enough prestige in the organization to negotiate on its behalf, and who have both the temperament and intellect to deal with the uncertainties of an ever-changing mediation environment.

To get the client to invest in this approach requires the client to be disabused of the notion that mediation is a casual process. If there are tax, antitrust, regulatory, and other issues that could be affected by a settlement, bring those to your

client's attention, and make it clear that those must be explored in advance of the mediation. They are seldom addressed well at the last moment. Similarly, explain that mediation will be a multisided dynamic. It will partly involve convincing the mediator and partly involve convincing the other side. The other side will similarly be involved in trying to convince the mediator and your client.

If there is intelligence in the community about this dispute, encourage your client to gather it. This does not mean rifling through your opponent's garbage. It means having your client and its representatives attuned to rumors in the market place that may be helpful in revealing what your opponent's true goals are. Understanding those, as well as understanding your own, is crucial to success.

Learn what your opponent is like. Talk to people who know him. You will be addressing a high ranking decision-maker on the other side, in all likelihood. What are his hidden psychological persuaders? If you had a jury composed of engineers, you would use engineering analogies. If you had school teachers on a jury, you would talk about the classroom. Find out about your opponent, just as you would about your judge or jury. Your opponent, even if he is the CEO of a Fortune 500 company, is human, and his personality and experience are crucial to framing both your presentation and your strategy.

Learn about your client as well and decide carefully how best to use the client at mediation -- and which client representatives to use if the client is an organization -- just as you would plan to present witnesses at trial. If there is a general rule, it is that a client should be active in the mediation. Demonstrating that a client is knowledgeable, articulate and able to respond quickly to a changing situation -- assuming that he is -- telegraphs effectively that the client will be a forceful advocate for the case at trial and will not be easily shaken. Of course, if the client has none of these qualities, or has a hair-trigger temper, it is best not to reveal that fact, assuming the other side doesn't already know. In a recent case, my client ultimately paid substantially less because the opposing client came across so poorly in the mediation that everyone in the room, including the opposing client, was sure he would do poorly at trial. By contrast, there are certain clients who come across as slightly madder than the Mad Hatter and marginally less rational that Moammar Gadhafi. Revealing that has its pluses in an odd sort of way. The other side knows it is dealing with someone who can and will do anything and everything. Occasionally, a phenomenon best described as the "tyranny of the unreasonable" takes over. In such cases, showing your client to be just a bit crazy may actually help produce an advantageous settlement; as a general rule, it does not.

You can never get to your destination if you don't know where you are going. As such, to reach a successful settlement, you need to know what you want to achieve. To help formulate your goals, it is advisable, early on, to determine what you would like the settlement documents to look like. This, most importantly, focuses your attention on what issues are important. It also has a secondary benefit. If you do reach an agreement, it may well be after hours of negotiation, or even late at night, when people want to rush away to get on with their lives or just simply to get to sleep. It is axiomatic that if you reach agreement, you document it immediately, before buyer's remorse sets in. However, starting to draft after hours of agonizing discussions is a terrible idea. The only thing worse is not to get the deal documented. What is [*35] the solution? Prepare. Well in advance of the mediation, outline the key points necessary to an agreement.

Two caveats are in order. The mediation, like a trial, will probably proceed differently from your expectations, so that excessive reliance on something you drafted earlier may be unwise. Second, pulling out a draft agreement after hours of mediation makes you look like a gambler pulling out a deck of cards. Everyone will assume the deck is stacked, marked and cut. Have an outline of key points -- perhaps preloaded on your personal computer (a frequent companion at mediation, just as at deposition, trial and hearings) -- and be ready to use it diplomatically to write out a settlement memorandum. Because you aren't perfect, consider ending that memorandum with a key proviso that states something like the following:

> The preceding memorandum contains only the key points in the settlement and is not comprehensive. It will be superseded by a more formal agreement. Notwithstanding, the parties intend this memorandum to be binding and specifically enforceable.

You can also consider adding a provision that empowers the mediator, or some other trusted neutral, to decide on the terms of the anticipated formal agreement if the parties reach an impasse. Make sure you have discussed this eventuality with the client in advance so you know how to close the deal properly.

A final point. When you actually do document the formal agreement anticipated by the memorandum, make explicit that it supersedes all prior agreements of the parties, including the settlement memorandum signed at the conclusion of the mediation. You want to have a binding agreement, but only one, not two or more.

The converse of the preceding principle is just as important. Don't spend a lot of time on a mediation brief, particularly one which will go only to the mediator. Your time is better spent on preparing for settlement discussions. There is one exception: It is essential to be familiar with the facts, particularly if you are going to be the person giving your side's version of the dispute often in the form of an opening statement.

Trial lawyers are familiar with opening statements and their importance. Knowing how to give one is invaluable. There is, however, a crucial difference between an opening statement in a mediation and one at trial. At trial, the neutrals -- judge and jury -- are your primary audience. At a mediation, your audience is primarily the client on the other side of the table. By force of habit, you will be inclined to address the mediator. Stifle the urge. Your true audience consists of the hostile sea of faces on the other side of the table, and more so the unfamiliar client faces than your more familiar fellow lawyer. You need not ignore the mediator, but you must remember that he is merely a facilitator, not a decision-maker. Winning him over is good, often helpful. It is important that he understand your position so that he can forcefully convey it to your adversary in private session. But remember, your opponent is infinitely more important than the mediator. The mediator can persuade, but the opponent can write -- or accept -- a check. As such, it is to your opponent that you must address your case. He is your most important audience, the person who can now hear -- without benefit of the filtering his own lawyer will provide -- just why his case is in trouble and why it is in his interest to settle. Mediation is unique in this respect. At trial, a client may absorb this fact as he watches the judge or jury turn against him. At mediation, the client is effectively the judge and jury, and it is incumbent upon you to make him feel the heat.

There is disagreement among commentators about how tough an opening statement can or should be. Some commentators feel that an excessively aggressive opening can destroy the goodwill that the simple act of agreeing to mediate has created, making negotiation more difficult and agreement less possible. This author respectfully dissents. While it is never appropriate, in any setting, to be vicious, mean or disrespectful to anyone, particularly someone you wish to persuade, that does not mean that you cannot be tough and aggressive in presenting your case. It is unlikely that your opponent has gotten a raw, uncensored view of how strong your case is, and how passionate your client is about fighting. This is your opportunity to convey that fact to the other side. Do so with logic and reason. Make it clear that you are a tough advocate, and a very articulate one at that. Assemble the facts and the law in the best possible way so that, at the end of your presentation, the key decisionmaker on the other side feels, somewhere in the pit of his stomach, that you might just beat him in court.

If you feel a need to be more moderate, let your client do it. After a 10- or 15-minute opening, when you sit down and thank those who have listened to you, your client can "spontaneously" say something like:

> As you can tell, we feel very strongly about the case. But, I want to make it clear, on behalf of my company, that we are here not to perpetuate this litigation, but to settle it. If we must fight, we will, and we do believe we will succeed. However, we also think, and I know that my esteemed colleague (opponent) Ms. X believes, that reaching a negotiated settlement is best for all concerned.

If this sounds like the old game of "good cop, bad cop," it is.

Commentators on mediation often emphasize that one of the benefits of mediation is that it enables clients to express their feelings, something often ignored in more traditional dispute resolution forums. I think this focus is erroneous. While it may be helpful in the right case for a client to emphasize how particular conduct, e.g., a car accident, caused him pain and suffering, that is the exception, not the rule. If your opponent learns how your client was bothered by a certain type of behavior, he will also ascertain that your client may be vulnerable to it. If alleged unfair competition has caused disruption of certain business relations, then the smart opponent will know precisely how best to make discovery hurt: by deposing customers or suppliers or salesmen or whomever your client reveals represents the area of his greatest pain. Resist the urge to make mediation a tool in your client's therapy. Let him work out his feelings with a trained professional. Mediation is business, and anything [*66] needlessly revealed during the process is more likely to hurt than help the case.

Certain processes cannot be rushed. Mediation is one of those. It might be convenient to be able to walk into the room, give your bottom line, and tell the other side to take it or leave it. It doesn't work that way. Settling cases is more like attending a swap meet than it is like buying a shirt at a department store. Don't lament that fact; embrace it. Prepare for the virtual certainty that there will be bargaining by:

> - *Tailoring your opening offer to be flexible.* Leave room, potentially in a number of places, for movement. Commentators refer to the process of trading offers as a negotiating dance. Don't expect to

make your best offer first and don't expect anyone to believe that your first offer is really your best offer. No one plays by those rules and you can't either.

- *Preparing your side for the negotiating process.* If you represent a corporation that is sending a number of representatives to a mediation, discuss this process in advance. Define not only your goals but the personnel assigned to achieve them. If one person has a good rapport with a member of the opposing team, then that person may be assigned to talk with him before or during the mediation. However, in general session (with everyone present) or in private session (with the mediator present), it is crucial that one person alone communicate your side's settlement offers, counteroffers and reactions. You can be that person, but it is generally better for the messenger to be the client or one of its executives. This rule is hard to follow; talk about it in advance, and as the mediation unfolds, remind everyone on your side about the rule. If there are multiple spokesmen on the same side with inconsistent positions, someone has planned or executed poorly. If your side is behaving like this in the presence of the mediator or the other side, put a halt to the discussion and meet with your client. You can then go back to the negotiations with one clear position communicated by one clear spokesman.

- *Listening carefully to the other side's counteroffers.* You should be able to anticipate most of what the other side will say, do, and offer, but occasionally, you will be surprised by a proposal that reveals new concerns, interests or weaknesses. Your skills as a trial lawyer will come in handy at a mediation. Reacting to what is said and done requires flexibility and preparation. As at trial, the only certainty is uncertainty.

Both within and outside mediation, I have often been asked whether a particular offer is my last, best, and final offer. If you say it is, then you have boxed yourself in. Not only that, no one believes you (even when you are telling the truth). If you say it isn't, then in the vernacular, you are negotiating against yourself. There is a way out of this box:

> Based on what we currently know about the case and taking into account your arguments, we believe that the offer we have made is the best we could make. Obviously, we would like to pay less and you would like to receive more; but, what we might like is not the issue. If you can give me a principled reason why my client should consider paying more, we will consider it; otherwise, we don't believe that any further adjustments are warranted.

In effect you are conveying at least two messages. First, you are flexible. Second, your flexibility is based on principle -- meaning the value of the case -- not demands, extortion or other extraneous factors. With this response, you have left the door open for dialogue and you have moved the dialogue to the plane of principle rather than petulance.

**Keep Talking**

At some point, hours or days after you have started, the mediation process will end. If it ends with an agreement, that is fine. But if you can't reach agreement, accept that as well. Parties and lawyers often get desperate as the mediation nears conclusion, but the dispute remains unsettled. It is possible, but exceedingly unlikely, that the mediation is the last chance to settle the case. More likely, there will be multiple opportunities -- at deposition, at court-ordered settlement conferences, before trial, during trial, even after trial and appeal -- to settle. As such, do not despair or let your client despair if you walk away without a deal. Not all cases should be settled, and almost none should be settled on any available terms. Most will eventually settle one way or another, so if you can't settle at the mediation, ask yourself what benefits you can achieve before you part ways.

Occasionally, you can agree to keep talking. Sometimes that dialogue will depend on one side or the other developing more information. Or it might depend on how well a witness does at a deposition or whether a particular motion is granted or denied.

Search for partial agreements if feasible, or part company respectfully, so that the possibility of future negotiation remains open. In all likelihood, settlement will eventually occur and both you and your client will benefit if you keep that probability in mind.